**TEXAS INSTRUMENTS INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 4810; Court No. 77–4–00580.**

United States Customs Court.

June 29, 1979.

Frederick L. Ikenson, Washington, D. C., for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Director, Commercial Litigation Branch, New York City; Sheila N. Ziff, Trial Atty., New York City), for defendant.

BOE, Judge:

The merchandise concerning which the within cause of action relates was imported by the plaintiff from El Salvador and en-

tered at the Port of Dallas/Fort Worth on August 2, 1976, for incorporation and use in solid-state electronic digital watches. Upon liquidation said merchandise was classified by the District Director of Customs at Houston, Texas, under item 720.75, TSUS, modified by T.D. 68–9, as assemblies or subassemblies for watch movements consisting of two or more parts joined together, providing:

Schedule 7, Part 2, Subpart E

Assemblies and subassemblies for watch movements consisting of two or more parts or pieces fastened or joined together:

\* \* \* \* \* \* \*

720.75     Other assemblies and subassemblies ... 4.5¢ for each jewel (if any) + the column 1 rate specified in item 720.65 for bottom or pillar plates or their equivalent therein (if any) + 1¢ for each other part or piece therein (if any), but the total duty on the assembly or subassembly shall not exceed the column 1 duty for the complete movement for which suitable, nor be less than 22.5% ad val. unless said 22.5 percent rate exceeds the column 1 duty for the complete movement.

The plaintiff contends that the merchandise in issue is properly classifiable under item 687.60, TSUS, modified by T.D. 68–9, as transistors and other related electronic crystal components, providing:

Schedule 6, Part 5

Electronic tubes (except X-ray tubes); photocells; transistors and other related electronic crystal components; mounted piezoelectric crystals; all the foregoing and parts thereof:

Television picture tubes:

\* \* \* \* \* \* \*

687.60     Other .................. 6% ad val.

In its answer to the plaintiff's complaint, the defendant raised two alternative affirmative defenses. In so doing, the de-

fendant alleges that in the event the subject merchandise is found to be not properly classified under item 720.75, TSUS, then, and in that event, the subject merchandise should be classified under item 720.82, TSUS.

The foregoing alternative claim, however, has been abandoned by the defendant. A second alternative claim of the defendant asserts that the merchandise is properly classifiable under item 720.86, TSUS, providing:

Schedule 7, Part 2

Assemblies and subassemblies for clock movements, consisting of two or more parts or pieces fastened or joined together:

\* \* \* \* \* \* \*

Other assemblies and subassemblies:

\* \* \* \* \* \* \*

720.86     For other movements .. 16% ad val. + 6.25¢ for each jewel (if any) + 0.75¢ for each other piece or part

At the time of the trial of the within action, respective counsel, within the approval of the court, entered into the following stipulations:

1. The official entry papers may be received in evidence, as an unmarked exhibit, with the understanding that defendant does not agree to the characterization of the imported merchandise appearing on said papers.

2. The imported merchandise is designated on the relevant invoice as X971, with or without other descriptive information.

3. Plaintiff's Exhibit 1 for Identification is a representative sample of the imported merchandise, and may be received in evidence.

4. Plaintiff's Exhibit 13 and 14 for Identification, each of which is a functioning watch module in a clear plastic case containing, among other things, a version of Exhibit 1, and a Texas Instruments DIS611 may be received in evidence.

5. The imported merchandise was manufactured in about July, 1976.

6. Solid-state digital electronic watches were first introduced in commerce in about 1972.

7. The only part of the watch into which the imported merchandise is incorporated, which defendant considers to be a moving part, is the quartz crystal component. [R. 7–8.]

From the testimony introduced by both the plaintiff and the defendant in the within proceeding, it appears to be undisputed that the merchandise in question consists of a monolithic integrated circuit chip, commonly referred to as an IC chip, which has been affixed to a frame or substrate permitting its encapsulation for subsequent use as a component of the module in a solid-state digital watch. Before proceeding to the basic issue before this court as to the proper classification of the subject merchandise, an elementary understanding with respect to the manner in which the subject article is manufactured and/or processed, its function as well as its relationship to other components ultimately comprising the module used in a solid-state digital watch, would appear to be not only salutary, but a necessary preface.

A definition of a monolithic integrated circuit chip in its simplest form may be found in the testimony of Mr. Jack Kilby, who invented this article or device in 1958 and received a patent thereon in 1964:

A monolithic integrated circuit chip is a silicon wafer in or on which electronic components, such as transistors, diodes, resistors and capacitors have been formed and interconnected to perform a desired function. [R. 535.]

With respect to the meaning of the term monolithic, the witness testified:

* * * "monolithic" refers to those circuits which are formed entirely in or on a single chip or wafer of semiconductor material. [R. 541.]

Silicon may be classified as one of the most commonly used semiconductor materials and is best characterized in the semiconductor industry as possessing the ability to conduct electricity under certain conditions. Accordingly, the process designed to create the integrated circuit chip is initiated by slicing a thin piece or wafer from a large cylindrical shaped bar of crystal silicon. After polishing, the silicon slice is subjected to a complex series of high temperature and photolithographic processes thereby causing a multitude of identical miniscule squares to be defined thereon, each of said squares being commonly referred to as a chip.[1] Through the application of photosensitive materials, the establishment of a geometric pattern, the introduction of chemicals and the further application of high temperatures, certain elements consisting of transistors, diodes and resistors are built within each defined chip comprising the silicon slice. In an evaporation process aluminum metal is allowed to cover the entire silicon slice. Again, after a further photolithographic process by which an interconnecting pattern is established followed by an etching away of a portion of the aluminum surface, there is thereby developed a metal pattern that interconnects the transistors, diodes and resistors built within each of the individual chips.

The process by which the integrated circuit chip is created as hereinbefore described is effected at the plant of the plaintiff at Sherman, Texas. Upon completion, the integrated circuit chips together with specifications and quality control documents are transmitted to the facility of the plaintiff in El Salvador for further processing. In the latter country, the individual integrated circuit chip is attached to a lead frame or substrate in order to provide a mechanical adherence. Around the periphery of each chip, small metal pads are located from which fine gold wires measuring 1,000th of an inch in diameter are attached to the lead frame substrate by means of heat and compression, thereby providing a connection from the chip to the external portion of the frame. The integrated circuit chip as affixed to the lead frame is encapsulated in a plastic mold providing protection from the

1. As illustrated by Plaintiff's Exhibit 8 admitted in evidence, each of the square chips measures approximately ⅛ of an inch from one side to the other.

environment, and further providing certain recesses or cavities therein for the subsequent accommodation of a quartz crystal, a capacitor, batteries and a light emitting diode display. It is in this form that the merchandise in question is returned and entered into the United States.

As the merchandise in question, the quartz crystal, the capacitor, and the display element are subsequently assembled by the plaintiff in its facilities within the United States, the unit becomes collectively known as a module ready for the fitting within a watchcase and acceptance of batteries.

■ In its determination of the issues involved herein, the court deems it sufficient to recognize without further amplification the presumption of correctness that attaches to the determination made by the District Director of Customs, as well as the burden incumbent upon the plaintiff to overcome this presumption and to prove otherwise. 28 U.S.C. § 2635(a). The court is of the opinion that the plaintiff has met this burden and has established that the subject merchandise as imported should be classified as transistors and other related electronic crystal components under item 687.60, TSUS.

■ Implicit in the District Director's determination that the merchandise in question is classified under item 720.75, TSUS, is the premise that the module in a solid-state digital watch of which the subject merchandise is an assembled component part is a "watch movement" within the purview of the tariff schedules. Headnote 2(b) of Schedule 7, Part 2, Subpart E, is of only limited assistance in its definition of this term:

> [T]he term *"watch movement"* means a timepiece movement measuring less than 1.77 inches in width and less than 0.50 inch in thickness.

Except for the measurement as to size and its association with a "timepiece," no further enlightenment is provided as to what constitutes a movement. In the absence, therefore, of a special or restricted meaning

given or intended to be given by the Congress, it is the obligation of the court to determine its common meaning. Although the determination of the common meaning of tariff terminology is a question of law as distinguished from a question of fact, the court, in the formulation of its judgment and the exercise of its determination, may rely on authoritative sources, the testimony of competent and expert witnesses as well as the construction and common interpretation of the term in question in the particular industry in which it has a special reference. *Davies Turner & Co. v. United States,* 45 CCPA 39, C.A.D. 669 (1957); *United States v. O. Brager-Larsen,* 36 CCPA 1, C.A.D. 388 (1948).

The term "movement" as it relates to instruments designed to designate time is defined in *Webster's Third New International Dictionary* (1966):

> [T]he moving parts of a mechanism that transmit a definite motion or transform motion; *esp*: a delicate train of wheelwork (as in a watch).

The term is, again, defined in *Webster's New Collegiate Dictionary* (1973):

> [T]he moving parts of a mechanism that transmit a definite motion.

Similarly, *Funk & Wagnalls New Comprehensive International Dictionary of the English Language* (1978) contains the following definition of the term (p. 832):

> 4. Mech. A particular arrangement of related parts accompanying a motion: the *movement* of a watch. [Italics in original].

The cogent testimony of plaintiff's witness, Henry Fried, viewed in conjunction with his long and intimate knowledge and experience in the horological industry, necessarily must be given weight and consideration. As a recognized expert in the industry, many definitions of terms used in the horological industry, including the word "movement," have been proposed and/or submitted to and approved by him before inclusion in Webster's dictionary, jewelers manuals and various other trade and technical publications. In response to questions by respective counsel as well as by the

court, Mr. Fried unequivocally stated that the term "movement" is not used to designate the collective component parts of a watch. His testimony remains undisputed throughout the within proceeding that the term "movement" is defined as a "linkage of mechanical objects to transfer motion from one source to another." (R. 334.) In the same manner as the term "movement" has a specific meaning in reference to a particular subject matter such as a "movement" in a political or social activity, a "movement" in a military maneuver or a "movement" in the musical or literary arts, so in the horological industry, the term possesses a distinct and unambiguous connotation. In the absence of any evidence offered by the defendant by way of contradiction, the plaintiff, therefore, has established by undisputed substantial evidence that the term "movement" as used in the horological industry refers to a mechanism, whether mechanical or electro-mechanical, which possesses some moving parts to which or from which motion is transferred.

The defendant, however, contends that a movement does occur within the module of which the merchandise in question is a component part. It is acknowledged that a quartz crystal, which is placed in one of the cavities formed in the plastic mold which encapsulates the integrated circuit chip, serves as an "equivalent electronic component." In this capacity, the molecular structure of the quartz crystal is subjected to excitation causing a vibration within its structure at what is termed an angstrom level of displacement.[2] In describing the nature and extent of the molecular movement of the quartz crystal, the plaintiff's witness, Chaffin, states:

It is such that if you looked under a microscope and compared its movement to human hair movement, or something of that nature, you might see the same amount of distortion with the hair laying there. There is movement, but it requires very, very high powered techniques which are required to discern it. Not even with a simple microscope could you see the movement. [R. 141–142.]

This court is unable to view the molecular vibration occurring within the structure of the quartz crystal as a motion within the contemplation of the definition of the term "movement." Unlike the conventional watch containing a balance assembly or the electro-mechanical watch containing a tuning fork in both of which a definite mechanical motion is transferred to other component parts within the movement,[3] the molecular vibrations or displacement of the quartz crystal does not transfer either mechanical or energy motion to any other component part included within the solid-state watch module. (R. 291–293.) The quartz crystal, possessing piezoelectric qualities, serves only to interact with an electronic circuit more particularly described as an oscillator built in or on the integrated circuit chip. With the quartz crystal serving as a feedback stabilizing element, the oscillating circuit or wave form is provided with a precise frequency of 32,768 cycles per second. This frequency signal is passed through the electronic networks of the integrated circuit chip dividing the frequency by one-half on each passage, resulting in the ultimate reduction of the frequency to one cycle per second. It is the latter one second cycle count which is collected, stored in the integrated circuit chip and ultimately translated into a numerical display in the light emitting diode of a solid-state digital watch.[4] The molecular vibration within the

---

2. An angstrom is defined as one ten-billionth of a meter.

3. In the Bulova Accutron watch, the most commonly recognized electro-mechanical timepiece "* * * the vibrations of the tuning-fork are converted into a mechanical drive through a small jewelled-tipped index spring attached to one of the tines of the fork. This moves an index wheel forward one tooth each vibration

* * *." K. Blakemore, *The Retail Jeweller's Guide* 191 (1970).

4. "The integrated circuit does all the functions that are performed in the normal watch by the miscellaneous gears from the balance wheel to the hands, including the various setting mechanisms. It is the integrated circuit that makes the quartz oscillate and divides the quartz frequency to one pulse per second. In the analog quartz watch this is all the integrated circuit

quartz crystal structure providing the feedback of an oscillator circuit at a precise and regulated frequency does not fall within the definition of a "movement," the common as well as commercial meaning of which has been established in this proceeding, in light of the absence of a mechanical transfer of motion to any other component part of the solid-state module.

The defendant, however, contends (1) that the Congress intended the term "watch movement" as used in the tariff schedules to include any device capable of measuring time, and (2) that to incorporate a requirement for the transfer of mechanical motion in the definition of the term "movement" would do violence to the legislative intent to encourage technological advances in the watchmaking industry.

In support thereof, the defendant in its brief submits extracts from the testimony of various witnesses representing foreign watch manufacturers, importers as well as representatives of the domestic watch manufacturing industry at hearings before the United States Tariff Commission (now the International Trade Commission) in its consideration of proposed provisions of the Tariff Schedules of the United States prior to ultimate enactment by the Congress. Of importance in this proceeding is the consideration of the nature of the controversy under discussion at said hearings, the ultimate resolution thereof and the resulting effect, if any, which might relate to a determination of the present issues at bar.

The relevant provisions relating to "watch movements" in the Tariff Act of 1930 are found in paragraph 367(a) thereof, providing in pertinent part:

Watch movements, and time-keeping, time-measuring, or time-indicating mechanisms, devices, and instruments, whether or not designed to be worn or carried on or about the person, all the foregoing, if less than one and seventy-seven one-hundredths inches wide, whether or not in cases, containers, or housings: * * *.

The extensive hearings before the Tariff Commission in its preliminary consideration of the proposed provisions to be included in the Tariff Schedules of the United States centered upon its contemplated intention to establish one schedule for watch movements regulated by a balance wheel and a hairspring and an additional independent schedule for watch movements not regulated in the foregoing conventional manner. By its proposed additional schedule, the Commission sought to provide independently for nonconventional watch movements which had then made their first appearance in the horological industry.[5] In reviewing the respective comments made at the hearings, it is noted that the domestic watch manufacturing industry and the American Watchworkers Association strongly supported the proposal of the Commission providing for a separate, independent schedule for nonconventional watch movements with an accompanying higher rate of duty. Representatives of the foreign watchmakers as well as the American importers strongly opposed the establishment of such a separate schedule. In the course of the comments and testimony made in opposition to the Commission's proposal, reference was made to the advancements made in the horological industry as well as to the possibility of utilizing in the future other and different operating and regulating devices. After an abortive attempt to establish a separate and independent schedule for nonconventional watch movements at a "compromise" rate of duty, the Commission, again, revised its proposed provision for the Tariff Schedules of the United States thereby assessing "timepiece movements" less than 1.77 inches in width at the rates prevailing in paragraph 367(a) of the Tariff Act of 1930. In the subse-

does. In the digital quartz, however, the I.C. further counts seconds, minutes, hours; contains all of the setting functions and provides the voltages and currents required to drive the LCD (liquid crystal display) or the LED (light emitting diode) display. Only since 1975 has it been possible to perform all of these functions in one integrated circuit." T. Hyltin, *The Digital Electronic Watch* 30 (1978).

5. Specific reference at the hearings was made to electric watches—the component parts of which were powered by a battery.

quent enactment of the present tariff schedules, watch movements, accordingly, were not confined to a specific structure but all movements within the requirements as to size were brought within the definition therein of a "watch movement."

The Tariff Act of 1930 did not define the meaning of the term "watch movement." The reason therefor was that the term had a specific commercial and common designation based upon its structure and component elements.[6] See *United States v. Continental Lamania, Inc.,* 21 CCPA 192, T.D. 46726 (1933); 72 Cong.Rec. 10029–32 (1930). The enactment of the Tariff Schedules of the United States marks the first attempt in the history of customs legislation to define the term "watch movement." In so doing, the Congress defines the same as a "timepiece movement" which meets the dimensional limitations of 1.77 inches in width and 0.50 inch in thickness. However, the Congress in its definitive description of a "watch movement" as a "timepiece movement" has not attempted to define the meaning of the term "movement." Nor has any judicial decision defining the meaning thereof been called to the attention of this court or been found independently.

In the present proceeding, however, it has been established by competent evidence that the common as well as the horological meaning of the term "movement" is a mechanism in which there is a physical transfer of motion. No evidence has been submitted by the defendant to controvert or qualify the established definition. Rather, the defendant invoking a questionable interpretation of the comments and testimony made at the Tariff Commission hearings, afore-referred to, seeks to attribute to the Congress the intent to place upon the term "movement" a meaning for tariff purposes different from the undisputed common as well as the horological meaning thereof.

The court is unable to accept the all-encompassing conclusion urged by the defendant that the legislative history evidences the Congressional intent to include any device, and the imported merchandise in question in particular, capable of or used in measuring time as a watch movement or an assembly or a subassembly thereof. It is, indeed, fallacious reasoning to speculate that the Congress intended for tariff purposes to place a meaning on the term "movement" other than its accepted common as well as commercial meaning, and include devices of every character, when, in fact, the only "movements" which were then in existence and which were the sole subject of Congressional consideration fell within the undisputed common as well as commercial meaning. In short, all of the "movements" concerning which the dispute had been centered at the time of the hearings prior to the enactment of the Tariff Schedules of the United States, possessed the same identical feature—a mechanical transfer of motion. Although general references were made throughout the hearings as to the *possibility* of new discoveries in the operation and regulation of watch movements, none of these devices was under consideration by the Commission nor, in fact, in existence. The patent on the monolithic integrated circuit was not received by the witness Kilby until the year 1964—subsequent to the enactment of the Tariff Classification Act of 1962. The stipulation entered into between the respective counsel establishes that the solid-state digital electronic watch in which the monolithic integrated circuit is a component part was first introduced in commerce in about the year 1972. To attribute to the Congress the intent to include the solid-state module and the subject merchandise, which is a component part thereof, within the provisions of a

---

6. An explanation of the principal components comprising a conventional watch movement is found in L. Copeland & R. Liddicoat, Jr., *The Jewellers' Manual* 181 (1967):

A watch movement can be divided roughly into five sections: (1) the *mainspring,* which is the powerplant; (2) the *train wheels,* which deliver power to the escapement; (3)

the *escapement,* which permits the slow, uniform dissipation of that power, permitting it to move the hands; (4) the *balance assembly,* which is the governor of the watch, since it governs, or controls, the timekeeping; (5) the *mechanism under the dial,* which carries the hands. [Italics in original.]

watch movement as provided by the present Tariff Schedules of the United States would endow this legislative body with a prophetic perception far transcending the very embryo of thought developing in the inventor's mind.

The court recognizes that tariff schedules, written for future as well as for present application, will embrace merchandise unknown at the time of their enactment. However, as explained in *Smillie & Co. v. United States,* 12 Ct.Cust.App. 365, 367, T.D. 40520 (1924):

> This rule, of course, does not operate to exclude articles which are not known at the time of the passage of the act, but which come into being later. As to all such articles the statute will be held to apply if the articles possess an essential resemblance to the ones named in the statute *in those particulars which the statute established as the criteria of the classification.* * * * [Emphasis added.]

The defendant urges that the merchandise in issue possesses the "essential resemblance" to watch movements particularly in that the subject merchandise is within the "specific parameter of width and thickness." Although the subject merchandise does fall within the dimensions prescribed for a "timepiece movement," the court, again, must repeat that the evidence herein fails to disclose wherein the imported merchandise bears any resemblance to an article described in the schedules as a "timepiece movement" as the evidence herein establishes the term to mean in its common as well as its commercial connotation.

In its effort to sustain the classification of the subject merchandise, the defendant has failed to consider the character and identity of this article at the time of importation. In this connection our appellate court has stated in the case of *United States v. Colibri Lighters,* 47 CCPA 106, 109, C.A.D. 739 (1960):

> As the Government properly points out, however, classification should not be determined on the basis of the use to which the individual articles included in the in-

stant shipment are to be put, but on the basis of chief use of articles of that class generally. *H. J. Baker & Bro. v. United States,* 37 CCPA 52, C.A.D. 419, and cases there cited. In determining such use it is proper to consider not only the testimony offered, but the characteristics of the merchandise itself.

As previously indicated herein, the evidence is uncontradicted that all integrated circuits are constructed and processed in substantially the same manner, notwithstanding the purpose and use for which they ultimately may be designed. Through the construction of appropriate patterns within the chip, the respective semiconductor elements are interconnected to attain the desired objective. Similarly processed integrated circuits, but possessing different diodes, resistors and transistors as well as differing interconnecting patterns, are constructed to perform a variety of other electronic functions whose capabilities may be designed for use in comptometers, calculators, television remote control receivers, bubble memory devices and photosensitive camera devices. In each of the afore-described integrated circuits, the form thereof or its encapsulating package necessarily is designed so as to be accommodated and utilized in the equipment for which it is intended.

When questioned as to whether the imported merchandise in the form of its encapsulation could be viewed as an integrated circuit, the plaintiff's witness, Kilby, testified:

> I would consider this to be consistent with the most basic philosophy and thrust of integrated circuits in that—in the sense that it contains provisions for not only forming, but electrical interconnecting, attaching leads, and providing a degree of mechanical integration of the required components for a particular function. [R. 538.]

In expressing his opinion as to the "packaging" of the subject merchandise and, in particular, the cavity recesses thereon, the witness further stated:

I think every electronic component is usually designed with an understanding of the environment, mechanical and physical environment in which it is to operate. This is simply one which has been optimized for a particular purpose; that of going in an electronic watch and, therefore, I tend to feel that the presence of these cavities, for instance, does not significantly change the intent or purpose of the design. [R. 539–540.]

Considering the admonition of our appellate court in *Colibri Lighters, supra,* the substantial unanimity of all of the evidence and testimony presented and, above all, the intrinsic characteristics, nature and function of the subject merchandise itself, this court can only conclude that the merchandise in question is more specifically provided for under item 687.60, TSUS. The acceptance of defendant's contention that the subject merchandise should be classified as a part of an assembly or subassembly of a watch movement, indeed, would fail to recognize that the principal element of the encapsulated merchandise in question consists of a singular electronic device, a monolithic integrated circuit, which to a great extent has revolutionized a multitude of industries in which its function is utilized. It might be well said with respect to the proceeding before this court that the electronic industry has not become a part of the horological industry, but, rather, a part of the horological industry has become a part of the electronic industry.

As a further defense to plaintiff's claimed classification, the defendant urges that the merchandise in question is more than an integrated circuit. A review of the evidence in the within proceeding, however, does not provide substantiation for the application of this doctrine. As stated in the case of *E. Green & Son (New York), Inc. v. United States,* 450 F.2d 1396, 1398, 59 CCPA 31, 34 (1971):

> Only the most general of rules can be ascertained from the previous decisions dealing with the "more than" doctrine, and it appears that each case must in the final analysis be determined on its own facts. * * *

The evidence herein establishes that the merchandise in question is a packaged integrated circuit bonded to a substrate to which leads have been attached. Although integrated circuits are substantially constructed similarly, the formal packaging or encapsulation thereof will vary in order to protect from the environment because of factors such as cold, heat, humidity or light, as well as to permit its utilization in a designed space. Professor Strauss, the sole witness on behalf of the defendant, advised the court that the merchandise in question was "a portion of a watch module containing an integrated circuit." (R. 519.) Because, however, the plastic mold encapsulating the integrated circuit chip bonded to the substrate possessed cavities or recesses to permit the subsequent housing of batteries, a quartz crystal, a capacitor and a digital display, the witness qualified his identification by concluding that the merchandise in question was *more than* an integrated circuit.

It would appear that the respective constructions placed upon the "more than" doctrine by the witness Strauss and by our appellate court, indeed, are at variance. It is acknowledged that the fixation of a lead to the substrate as well as the formation of certain cavities in the plastic mold in order to provide subsequent accommodations for other components are additional features of the article in question. However, it would appear self-evident that these features are not co-equal with the primary function and purpose of the encapsulated merchandise in question, but, indeed, subordinate and auxiliary thereto. The cavities have been formed in the plastic mold encapsulating the integrated circuit chip solely to accommodate and provide a resting place for other components of the watch module when provided. To give such cavity recesses or a lead extension, a function of such significance as to be co-equal with the function of the encapsulated integrated circuit chip most certainly would ignore the acknowledged primary time-keeping role of the latter device. As clearly established by a preponderance of all the evidence, the accom-

modations for the future assembly of other components as well as the lead extension for a future connection with other components merely serve as a conduit permitting the singularly ingenuous capabilities of the encapsulated integrated circuit chip to be connected to the outside environment and subsequently utilized. *Amico, Inc. v. United States*, 586 F.2d 217, 66 CCPA ——, C.A.D. 1214 (1978); *United States v. Oxford International Corp.*, 517 F.2d 1374, 62 CCPA 102 (1975); *Trans-Atlantic Company v. United States*, 471 F.2d 1397, 60 CCPA 100 (1973); *Nootka Packing Co. v. United States*, 22 CCPA 464, T.D. 47464 (1935); *Astra Trading Corp. v. United States*, 56 Cust.Ct. 555, C.D. 2703 (1966).

Finally, the defendant contends in the alternative that if the merchandise is found not to have been properly classified under item 720.75, TSUS, it is properly classifiable under item 720.86, TSUS, as other assemblies and subassemblies for clock movements.[7] Presumably, the reasoning of the defendant is that watches, under subpart E, headnote 2(a),[8] must contain movements, and that if the movement is not a "watch movement" under headnote 2(b), then it must be a "clock movement" under 2(c).

■ The short answer to this contention is that headnote 2(a) does not create the requirement that a watch contain a movement. Rather, its purpose is to specifically define a watch as a timepiece, which is suitable for wearing or carrying on or about the person. In the instant case, however, the issue is not whether the imported article is ultimately used in a watch, but whether it constitutes a movement within the intendment of the Tariff Schedules of the United States. Headnote 2(a) does not serve to answer this question. The concluding clause of headnote 2(a): "* * * whether or not the movement therein is within the definition of 'watch movement'

in headnote 2(b) * * *," merely serves to provide that if a watch does contain a movement, as that term is commonly understood, it may either be a watch or a clock movement, depending upon whether it satisfies the dimensional limitations for "watch movements" in headnote 2(b). The sole factor distinguishing a watch movement from a clock movement for tariff purposes is the size thereof.

It having been established to the satisfaction of this court that the module in the solid-state digital watch does not incorporate the transfer of physical motion to or from any of its components, and that the merchandise in issue is more specifically provided for under item 687.60, TSUS, the defendant's alternative claim must fail.

The defendant in the conclusion of its brief urges that the affirmance of plaintiff's claimed classification would make a "shambles" of the tariff schedules. The court is unable to share such a dire prophecy.

New and sometimes unimaginable horizons have only recently opened and will continue to open in the electronic and semiconductor industries. Sophisticated devices are being created to perform functions hitherto performed by a means which might be equated with the horse and buggy in its relationship to the automobile of today. The greatest injury that could be caused to our present tariff schedules would be to attempt to fit each such newly created device in a pigeon-hole classification dictated by the instrument in which it might be utilized, irrespective of its individual identity. Indeed, untold confusion could thereupon be wrought.

The integrity of the tariff schedules will be far greater preserved if artificial classifications are not rationalized under antiquated schedules neither designed nor intended

---

7. Headnote 2(c) provides:

    (c) the term *"clock movement"* means any movement or mechanism, other than "watch movements" as defined in headnote 2(b), above, intended or suitable for measuring time.

8. Headnote 2(a) provides in pertinent part:

*For the purposes of this subpart—*

    (a) the term *"watches"* embraces timepieces * * * suitable for wearing or carrying on or about the person, whether or not the movement therein is within the definition of "watch movement" in headnote 2(b) * * *.

for present day application. Should consistency with historical purpose or desired uniformity in interpretation be deemed to dictate otherwise, such a determination necessarily lies solely within the discretion of the Congress, not within the province of this court.

The court, accordingly, finds that the plaintiff has sustained its dual burden of proof in establishing that the liquidated classification of the merchandise in issue by the District Director of Customs under item 720.75, TSUS, was in error and incorrect and that the claimed classification with respect to the subject merchandise under item 687.60, TSUS, is correct and proper.

Let judgment be entered accordingly.