**HERAEUS–AMERSIL, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 80–9–01501.**

United States Court of International Trade.

April 18, 1986.

Fitch, King & Caffentzis (Richard C. King), New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Civ. Div., Dept. of Justice (Susan Handler-Menahem), New York City, for defendant.

*Memorandum Opinion and Order*

DiCARLO, Judge:

Plaintiff contests the classification under item 605.05, Tariff Schedules of the United States (TSUS), of two entries of precious metal contact tape from the Federal Republic of Germany claiming that the correct classification is under item 685.90, TSUS. Defendant now seeks classification under item 605.66, TSUS. Since defendant concedes that Customs classification was erroneous, no presumption of correctness attaches to the classification urged by defendant. *See Jarvis Clark Co. v. United States,* 733 F.2d 873, *reh'g denied,* 739 F.2d 628 (Fed.Cir.1984).

The question presented is whether the tapes are (1) advanced beyond the state of materials and are contacts which are parts of relays described under item 685.90, TSUS, or (2) not advanced beyond the state of materials so that classification is proper under item 605.66, TSUS, as semimanufactured rolled precious metal.

The Court holds that the tapes are properly classified as parts of relays under item 685.90, TSUS.

The case was submitted to the Court on the following stipulated facts:

1. The merchandise involved in this action consists of contact tape composed of two layers, the upper being (by weight) 91.7% gold/8.3% silver, and the lower 60% palladium/40% silver.

2. The tape was imported wound in continuous lengths on Western Electric No. 544 Delrin Reels. Each reel was marked "R156", and each reel was labeled showing the gross, net, and tare weights in grams. Each reel was wrapped with a minimum of one layer of thin polyethelene strip, and was packed in a carton or box with packing surrounding each reel. Certificates of compliance to the Western Electric purchase specification and a laboratory chemical analysis report of major constituents accompanied each shipment.

3. The imported merchandise was manufactured to, and conforms to, Western Electric Specification 900128547.

4. The imported merchandise was designed for, and used only as, contacts in AF-type telephone relays manufactured by Western Electric.

5. AF-type telephone relays are composed of a coil armature assembly and a contact spring pile-up assembly.

6. The contact spring pile-up assembly contains moveable sub-assemblies called contact springs and fixed contact sub-assemblies called transfer springs.

7. A relay can have as many as twelve moveable contact springs and six transfer springs.

8. The moveable springs in the spring pile-up assembly each have two precious-metal contacts.

9. The mating transfer spring has one contact for normally open operation and one contact for normally closed operation.

10. On the average there are twenty-four contacts in each relay.

11. Transfer springs and contact springs are designed in clusters in which four or six springs are held together by two webs.

12. The contact spring cluster is punched from a continuous strip of 0.0006 inch phospher-bronze material; the transfer spring cluster is punched from 0.025 inch copper nickel allay.

13. The contact spring clusters and transfer spring clusters appear as depicted below:

[Diagrams omitted.]

14. The contacts are welded to the ends of the springs, which are located at Area A in the depiction under paragraph 13 of this Stipulation.

15. The shear strength requirements of the welds on the contacts are:

Contact spring—12 to 22 lbs.

Transfer spring—20 lbs. minimum

16. The maximum of 22 pounds on the contact spring weld serves to eliminate spring distortions which result from excessive welding temperatures.

17. The contacts are positioned on the springs to within ± 0.005 inch from the reference.

18. When assembled in a relay, the contact spring contacts and the relay spring contacts must have maximum mating of contact surfaces.

19. In the earliest designed welders which welded contacts to the contact springs, each contact had to be individually welded to the spring cluster.

20. Manufacturers of contact cluster springs and transfer cluster springs developed a manufacturing method by which contact tape could be welded to the tips of each of the springs of the spring cluster which had contacts attached, and then cut to the correct length to form a contact. This method avoided the problem of feeding contact slugs and resulted in greater accuracy in contact positioning.

21. To use the weld-then-cut contact tape application method requires that contact tape be fed over the tip of the spring in a direction that coincides with the longitudinal axis of the spring.

22. To use the weld-then-cut process, it is necessary to insure the weld strength of the welded contact can with-

stand the shearing force of cutting and that the contact form is not distorted.

23. The weld-then-cut process is now used to manufacture contact spring clusters and transfer spring clusters. This manufacturing process is performed by an automatic transfer spring welder for transfer spring clusters; and by an automatic contact spring welder for contact spring clusters.

24. The operations of the automatic contact spring welder and automatic transfer spring welder, and development and construction of the contact and transfer spring contacts are described in Exhibit 1 to this Stipulation, Califano and Scherb, *Spring Assemblies for [M]iniature Relays*, XII, The Western Electric Engineer (1968).

The stipulation further provides:

The entry papers and the following exhibits attached to the Stipulation are deemed admitted into evidence and may be considered by the Court without further foundation being laid:

Exhibit 1: Califano and Scherb, *Spring Assemblies for Miniature Relays, XII, The Western Electric Engineer (1968).*

Exhibit 2: Advertising Brochure published by Hereaus Volkert, entitled *"Precious Metal Contact Tapes."*

Exhibit 3: Advertising Brochure published by W.C. Heraeus GmbH, entitled *"Automatic Welding Machine, type KSA 600."*

Exhibit 4: A contact spring cluster with the top web cut and contacts welded in place.

Exhibit 5: A photograph of contact tape wound on a reel in the same condition as the merchandise involved in this action was imported.

▇▇ A provision for parts includes unfinished parts which have been so far advanced in manufacture as to be dedicated solely to a specific use. *Geo. S. Bush & Co. v. United States,* 32 Cust.Ct. 316, 321, C.D. 1620 (1954); General Interpretive Headnote 10(h), TSUS. Whether the imported contact tapes are materials or unfinished parts depends on whether they were sufficiently advanced toward and dedicated to use as contacts for relays at the time of importation, and were capable of no other substantial commercial use. *See Finn Bros. Inc. v. United States,* 59 CCPA 72, 75–76, C.A.D. 1042, 454 F.2d 1404 (1972); *Paramount Import Export Co. v. United States,* 45 CCPA 82, 85–87, C.A.D. 677 (1958).

Defendant claims that the merchandise comes within the common meaning of the term "wire" and therefore comes under the definition of "semimanufactured" contained in Headnote 2(b) of Schedule 6, Subpart A, which covers item 605.66, TSUS. Defendant says the merchandise is not sufficiently advanced toward or dedicated for use as parts of relays since (1) it has more than one use and, (2) it undergoes significant processing after importation.

Defendant's contention that the contact tape has a variety of uses is based on plaintiff's advertising brochure (Exhibit 2) which states in part:

A major application for precious metal tapes is electrical switch contacts, either movable contacts on relay springs or as fixed contacts on stationary blades (crossbar contact systems). Further applications include sliding and wiping contacts, plug connectors, controls sliders, card edge connector contacts, pushbuttons, etc.

The brochure simply demonstrates the availability of many different kinds of precious metal tapes and their applications. The brochure does not state that tape designed solely for contacts in relays can be used for any other purpose.

▇▇ Paragraphs three and four of the stipulation state that the contact tape was manufactured to particular specifications and that it was designed for, and used only as, contacts in certain telephone relays. The absence of any evidence of alternate uses may be considered by the Court in determining whether the merchandise is dedicated exclusively to its ultimate use. *See United States v. Nylonge Corp.,* 48 CCPA 55, 62–63, C.A.D. 764 (1960). Based

on the stipulation, the photographic evidence, examination of all of the exhibits and the absence of evidence that the contact tape is adaptable to any use other than its actual use, the Court concludes that the importations are dedicated exclusively to use as contacts for relays.

■ Defendant also argues that the contact tape in its imported form has not been advanced beyond the state of materials because the tape must be cut after importation, and before cutting it is positioned on the relay transfer springs and welded to certain strength requirements. Defendant argues that until the tape undergoes such processing, the contact tape is not identifiable as parts of relays. The Court disagrees.

The cases have consistently held that importations consisting of small articles manufactured together in one piece should be classified as if already cut apart:

> The rule ... recognizes the fact that most small articles are not produced as individual or separate products.... The rule of decision is therefore established that where such articles are imported in the piece and nothing remains to be done except to cut them apart they shall be treated for dutiable purposes as if already cut apart and assessed according to their individual character or identity. This follows, however, only in case the character or identity of the individual articles is fixed with certainty and in case the woven piece in its entirety is not commercially capable of any other use.

*United States v. Buss & Co.*, 5 C.C.A. 110, 113, T.D. 34138 (1914).

In *United States v. Nylonge Corp., supra,* the Court held that blocks of sponge material which had not been cut into pads prior to importation were classifiable as finished or partly finished sponges rather than as blocks of cellulose compounds not made into finished or partly finished articles. 48 CCPA at 62–63; *see also R.T. Saunders & Co. v. United States,* 54 CCPA 53, C.A.D. 904 (1967).

More recently, the Court in *Doherty-Barrow of Texas, Inc. v. United States,* 3 CIT 228 (1982), held that steel strip dedicated for use in making steel bale ties and which needed only to be cut to length was dutiable as bale ties rather than as steel strip.

The Court disagrees with defendant's argument that the contact tapes must undergo significant processing before they can be classified as parts since they must be positioned and welded as described in paragraphs 14–23 of the Stipulation and Exhibits 1 and 3. Paragraph 19 of the Stipulation states that under the earliest designed welding process, each contact had to be individually welded to the spring cluster. The individual welding of the contacts was part of an assembly process in which contacts were integrated into the relay. While advancements in technology have provided a more efficient method of integrating the contacts into the relays, the process is still one of assembly. Therefore the Court finds it is irrelevant whether the contacts are welded and positioned before or after they are cut.

The cases relied on by defendant are distinguishable. In those cases, the merchandise was not stipulated or found to be dedicated to any particular use, or incapable of other uses. *See, e.g., Avins Industrial Products Co. v. United States,* 72 Cust.Ct. 43, C.D. 4503, 376 F.Supp. 879, *reh'g denied,* 72 Cust.Ct. 147, C.D. 4522 (1974), *aff'd,* 62 CCPA 83, C.A.D. 1150, 515 F.2d 782 (1975) (merchandise required further processing, was adaptable to other uses); *Dehler Signoret Corp. v. United States,* 7 Cust.Ct. 103, C.D. 545 (1941) (merchandise not dedicated to any particular use).

Judgment will be entered accordingly. So ordered.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the merchandise imported under cover of entries 152735 and

152736 are properly classifiable under item 685.90, TSUS, with duty at the rate of 8.5 percent *ad valorem;* and it is further

ORDERED that the Regional Commissioner of Customs in New York shall reliquidate entries 152735 and 152736 under item 685.90, TSUS, with duty at the rate of 8.5 percent *ad valorem,* and shall refund any excess duties paid, together with interest, as provided by law.