**E.M. CHEMICALS, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 85–11–01610.**

United States Court of International Trade.

Oct. 18, 1989.

Amended Judgment Oct. 30, 1989.

Freeman, Wasserman & Schneider, Philip Yale Simons and Jerry P. Wiskin, New York City, for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div. U.S. Dept. of Justice; and Karen P. Binder, New York City, U.S. Customs Service, of counsel, for defendant.

## OPINION

MUSGRAVE, Judge.

The Customs Service classified imported liquid crystals used in liquid crystal displays as "chemical mixtures" under item 407.16 TSUS. Plaintiff protested this classification, claiming the liquid crystals are finished commercial parts used exclusively in the manufacture of liquid crystal displays, thus qualifying as parts of "indicator panels or other visual signalling apparatus" under item 685.70 TSUS. *Held:* Plaintiff has overcome the presumption of correctness of the government's classification; liquid crystals are properly classified under item 685.70 TSUS.

## BACKGROUND

Plaintiff E.M. Chemicals (now EM Industries; hereinafter "EM") challenges the tariff classification of liquid crystals imported from England and West Germany during the years 1982 and 1983. All of the merchandise in issue was classified by the U.S. Customs Service as chemical mixtures. EM contests that classification, claiming the liquid crystals are properly classified as "parts of indicator panels or other visual signalling apparatus." Defendant United States has asserted an alternative classification with respect to three of the imported liquid crystals.

The relevant tariff provisions are as follows:

Classified Under:
Schedule 4. Chemicals and Related Products.
Part 1, Subpart B.—Industrial Organic Chemicals
* * *
Mixtures in whole or in part of any of the products provided for in this subpart:
* * *
407.16   Other .............. 1.7 cents per pound + 13.6% ad valorem

Defendant's Alternative Classifications of CB–15, M–30 and K–15:
Cyclic organic chemical products in any physical form having a benzenoid, quinoid, or modified benzenoid structure, not provided for in subpart A or C of this part:
* * *
Other:
405.60   Products provided for in the Chemical Appendix to the Tariff Schedules .................. 0.1 cents per pound + 20.5% ad valorem
405.62   Other .................... 13.5% ad valorem

Plaintiff's Claimed Classification:
Schedule 6. Metals and Metal Products.
Part 5. —Electrical Machinery and Equipment.
* * *
685.70   Bells, sirens, indicator panels, burglar and fire alarms, and other sound or visual signalling apparatus, all the foregoing which are electrical and parts thereof...... 3.4% ad valorem

Insofar as no genuine issue of material fact exists, the parties' cross-motions for summary judgment can be disposed of upon resolution of the issue of law presented: whether nematic liquid crystals, as imported, are classifiable under item 685.70 TSUS as parts of "indicator panels or other visual signalling apparatus," or under item 407.16 TSUS as "other chemical mixtures."

At the time of importation, liquid crystals were used exclusively in the manufacture of various LCD's.[1] Liquid crystals have properties of both fluids and solids, although they also possess properties that are not found in *either* fluids or solids.

1. This use apparently included some experimental *LCD application.* Plaintiff's Brief at 27.

The liquid crystals at issue here are nematic, which respond to an electric field by randomly "twisting" along their axes, thereby changing their optical properties. To stabilize this random twisting, thus enhancing the commercial usefulness of nematic liquid crystals, a "twist agent"[2] is added.[3] Nematic liquid crystals are commonly found in watches, calculators, gasoline pumps, paging devices, telephones, toys, and scientific and medical equipment.

The manufacture of commercial liquid crystals begins with the synthesis of individual compounds, described by EM as:

often involving 10 or more steps ... the synthesis of individual compounds involves the chemical reaction of precise amounts of the appropriate chemical reagents at elevated temperature under nitrogen pressure, and, then, purification of the compound by vacuum distillation ... [thus] providing the capability to adjust the chosen physical property over a wide range whilst keeping all other properties essentially constant. Plaintiff's Brief at 7 (citing Allan Declaration, Exhibit C).

This allows EM to produce a commercial product with specific physical properties suitable for use in a particular LCD.

The finished LCD is comprised of a specific amount of liquid crystal sandwiched between two "plates," one of which must be transparent. The other may be transparent or serve as a backing mirror. Each plate has the electronic connections necessary to activate the liquid crystals. The configuration of the electronics depends upon the application of the display. Using polarizers above and below the liquid crystal sandwich, light is passed or blocked, in orchestration with the molecular orientation of the crystals, causing alphanumeric or other characters to be "displayed."

## DISCUSSION

A presumption of correctness attaches to a classification by the U.S. Customs Service; to overcome the presumption, the importer must demonstrate the government's classification is incorrect, or persuade the court of the merits of a better classification. 28 U.S.C. § 2639(a)(1). *See Stewart–Warner Corp. v. United States*, 748 F.2d 663 (Fed.Cir.1984); *Jarvis Clark v. United States*, 733 F.2d 873 (Fed.Cir.1984); *Schott Optical Glass, Inc. v. United States*, 11 CIT 899, 678 F.Supp. 882 (1987). The government argues their classification of the liquid crystals as chemical mixtures should be upheld, with the exception of crystals CB–15, K–1 and M–30, these being properly classified under the claimed alternatives of items 405.60 and 405.62 TSUS. EM asserts the liquid crystals are not utilized for any of their chemical properties, thus necessitating their removal from the chemical schedule, nor are they a mere mixture of chemicals. The liquid crystals represent finished commercial products that have undergone substantial processing to prepare them for use in LCD's, and have *no* other use *but* as parts of LCD's. Therefore, since LCD's are analogous to indicator panels, EM maintains the liquid crystals should be classified as parts of indicator panels or other visual signalling apparatus.

The Court finds EM's argument persuasive, and holds that the importer EM has overcome the presumption of correctness of the government's classification (excepting, of course, the three crystals which the government initially misclassified, to which no presumption of correctness attaches). The better classification for the nematic liquid crystals at issue is under item 685.70 TSUS, and the government's alternative classifications are rejected.

The government's claim that *Tomoegawa USA, Inc. v. United States*, 12 CIT ——, 681 F.Supp. 867 (1988), mandates classification of liquid crystals under Schedule 4 is unconvincing. Because certain photographic chemicals—utilized for their electrostatic, rather than chemical, properties—were classified under Schedule 4 in

---

**2.** One of the liquid crystals at issue, specifically "CB–15," is in itself a twist agent.

**3.** This addition normally occurs after importation, but if done before, the imported liquid crystals are characterized as "predoped."

*Tomoegawa,* the government argues that so too must liquid crystals—utilized for their physical, rather than chemical, properties—fall under the chemical schedule.

Such an argument ignores the critical fact that in *Tomoegawa,* the importer tried to equate the merchandise with an item (ink) specifically provided for in the tariff schedules. The essential ingredient (liquid) for that specific item was missing from the imported merchandise, and the government's classification prevailed. Here, the question is quite different; no specific designation for liquid crystals exists in the Tariff Schedules (as it did for ink), and the court must determine the correct classification as a matter of law. Thus, the utilization of liquid crystals for their physical, rather than their chemical, properties demands their removal from the chemical schedule.

In addition, liquid crystals more closely resemble manufactured commercial products than chemical mixtures. In *Pharmacia Laboratories, Inc. v. United States,* 66 Cust.Ct. 202, C.D. 4190 (1971), the court held Sephadex, a synthetic gel formed by a chemical mixture of polysaccharide dextran and epichlorohydrin, to be "made by a number of steps which can be designated as a manufacturing process and that it is, as the end result of such a process, a manufactured commodity," *id.* at 207, and rejected the importer's claim that the merchandise was a chemical mixture. *See also Phillip Bros. Ore Corp. v. United States,* 45 Cust.Ct. 64, C.D. 2199 (1960).

Additionally, in *United States v. Shell Oil, Inc.,* 44 CCPA 54, C.A.D. 637 (1957), the court rejected the government's claim that "Teepol," a product used principally as a detergent, should be classified as a chemical compound or mixture. Relying on lexicographic definitions of "mixture" and "compound," the court held the import was

"not produced by a mere mixing of its ingredients but by an elaborate process ... and may include different chemical compounds in relatively close association." *id.* at 59. Thus, Teepol was classified as a manufactured item, not specially provided for.

Similarly, liquid crystals are formed by complex chemical processes, rather than a mere mixing. Various chemical compounds form a discrete, identifiable product that can be utilized in differing proportions and combinations to produce an assortment of LCD's, depending on the physical properties required in each display. As such, liquid crystals are not chemical mixtures, but rather a finished commercial product dedicated only to use in LCD's.

The government mistakenly places much reliance on Headnote 3(a) to Schedule 4, defining "mixtures." [4] The government argues that Headnote 3(a) supports its position that the complexity of the manufacturing process has no relevancy under Schedule 4 TSUS. Yet *Shell, Phillips Bros., Pharmacia* and their progeny indicate exactly the opposite; that courts *should* focus on the complexity of the process used to manufacture the finished product.

Furthermore, Headnote 3(a) was included in Schedule 4 only to provide for a more uniform definition of "mixture." *See Tariff Classification Study,* Explanatory Notes (November 15, 1960). It does not mandate classification of an article under Schedule 4 merely because the article can be described as a mixture.

The parties also do not dispute that the only use of liquid crystals during 1981–1984 was in LCD's. Liquid crystals had no commercial use as chemicals. Under General Interpretive Rule 10(c), when an article is described by more than one item, it is to be classified under the provision which describes it most specifically. *See, e.g., Ace-*

---

4. Schedule 4 headnotes:

&ast; &ast; &ast; &ast; &ast; &ast;

3. (a) The term *"mixtures,"* as used in this schedule, means substances consisting of two or more ingredients (i.e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i.e., brought about by mechanical, physical, or chemical means), which

do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

to Chemical Co. v. United States, 59 CCPA 212, 220–21, 465 F.2d 908, 914 (Fed. Cir.1972). Liquid crystals are more specifically provided for outside the chemical schedule, under the tariff provision most accurately describing their use. Item 685.-70 TSUS is a "use" provision, and describes the imported items with more relative specificity than the basket provisions relied upon by the government. "It has been the consistent view of the court that a provision which describes an importation by its use is more specific than one which provides for an importation by a general description." Conray Products Co. v. United States, 64 Cust.Ct. 582, 584 (1970), citing Drakenfeld & Co. v. United States, 2 Ct. Cust.Appls. 512, T.D. 32248 (1912). Thus, item 685.70 TSUS more specifically describes the liquid crystals than the chemical provisions advanced by the government.

Before addressing EM's argument that nematic liquid crystals should be considered "parts" for tariff purposes, it must be determined whether LCD's come within the purview of item 685.70 TSUS as "indicator panels or other visual signalling apparatus." The government argues that LCD's belong outside item 685.70 TSUS because only devices which signal or alert the user of abnormal or unusual circumstances belong under this subheading. Relying particularly on NEC America, Inc. v. United States, 8 CIT 184, 596 F.Supp. 466 (1984), aff'd, 760 F.2d 1295 (Fed.Cir.1985), the government claims LCD's are not specifically devices, the purpose of which is to signal or alert the user of abnormal or temporary conditions. However, NEC deals with the classification of radio pagers which contained LCD's (which, in turn, contained liquid crystals); because of their "superior communication capability," 8 CIT at 191, 596 F.Supp. at 471, radio pagers were not classifiable under item 685.70 TSUS.

The holding of NEC America does not apply to LCD's themselves, which can be incorporated not only in radio pagers, but also in watches, clocks, meters, calculators and a host of other products, as previously noted. Supra at 724. The government has fallen into the proverbial trap of comparing apples with oranges; the classifica-

tion of the ultimate product into which the LCD's are incorporated is not at issue here, nor is the rationale of NEC America directly relevant. See also BASF Wyandotte Corp. v. United States, 855 F.2d 852 (Fed.Cir.1988).

Other cases cited by the government to illuminate the scope of item 685.70 TSUS involve the classifications of items, none of which are analogous to LCD's. Carling Electric Co. v. United States, 7 CIT 303, 592 F.Supp. 667 (1984), aff'd, 757 F.2d 1285 (1985) (indicator lights); Oxford Int'l Corp. v. United States, 75 Cust.Ct. 58, C.D. 4608 (1975) (taillights); Amersham Corp. v. United States, 5 CIT 49, 564 F.Supp. 813 (1983) (foil disks), and A & A Int'l, Inc. v. United States, 5 CIT 183, 1983 WL 5002 (1983) (metal detectors).

The court finds Intercontinental Air Freight, Inc. v. United States, 62 Cust.Ct. 214, C.D. 3731 (1969), and Texas Instruments, Inc. v. United States, 82 Cust.Ct. 287, C.D. 4811, 475 F.Supp. 1183 (1979), aff'd, 67 CCPA 59, C.A.D. 1244, 620 F.2d 269 (1980), to be dispositive. In Intercontinental, the disputed merchandise consisted of 12, flat, parallel plastic strips, each one etched with a particular number, decimal point or comma, and each connected to an individual light bulb which, when activated, sent light through the strip to be refracted at the point of the etched symbol. The end result was a digital display, with each strip constituting an indicator, and, when attached together, forming an indicator panel. Adopting the importer's claimed classification under item 685.70 TSUS, the court ruled that the visual transmission of information through the illumination of specific numbers equalled a "signal" within the scope of the claimed classification, id. at 217. Thus, the imported indicator was held to be a visual signalling apparatus, id. at 218.

LCD's can be described as performing the same function as the indicators above. They convey information in digital or other alphanumeric form, enabling the user to view images formed by the configuration of liquid crystals sandwiched between two plates. Although light bulbs are not re-

quired for LCD's to transmit this information, electrical currents are still necessary to activate the make-up of nematic liquid crystals for display purposes (just as light bulbs depend on electricity).

Furthermore, although this court may refer to lexicographic definitions in ascertaining the meaning of items in TSUS, they are of little assistance when struggling with the amorphous term "indicator panel." The rapidly expanding technology of LCD design also limits the usefulness of dictionary definitions.

Likewise, the legislative history [5] of the relevant provisions is unavailing.

In *Texas Instruments*, 82 Cust.Ct. 287, 475 F.Supp. 1183, the court held the government's classification of light emitting diodes (LED's) found in watch dials under item 720.40 TSUS ("watch movements") incorrect, and classified the LED's according to the stipulation of the parties as "indicator panels" under item 685.70 TSUS.

The holding of *Texas Instruments* controls here. Even though the parties stipulated that plaintiff importer would prevail under the claimed classification should the government's classification prove incorrect, the court decided the case "in light of the evidence adduced *in this proceeding.*" *Id.* at 290, 475 F.Supp. 1183 (emphasis added). The opinion also states: "[f]rom the *entire record in this proceeding,* the court is satisfied that the merchandise is properly classified, as claimed by plaintiff, as an indicator panel or a visual signalling apparatus." *Id.* at 293, 475 F.Supp. 1183 (emphasis added). Therefore, the fact that the court's ruling was compelled by the stipulation between the parties does not detract from the force of that holding. The classification of LED's under item 685.70 TSUS resulted from the court's examination of *all* the evidence.

Part of that evidence relied upon by the *Texas Instruments* court was a series of Customs Ruling letters addressing the proper classification of LED's and LCD's, dated December 29, 1974. *Id.* at 293, fn. 5, 475 F.Supp. 1183. "The Customs Service has classified ... liquid crystal [displays] incorporated in numerous other appliances and articles, other than watches and clocks, as indicator panels or other visual signalling apparatus under item 685.70, TSUS." *Id.*

Because LCD's perform virtually the same function as LED's (the main difference being that LED's are self-illuminating, while LCD's are not), *Texas Instruments* mandates a finding by this court that LCD's come within the ambit of item 685.-70 TSUS.

Two other factors bear on this Court's decision. First, courts have found past interpretations of item 685.70 too restrictive. *See A & A Int'l, Inc. v. United States,* 5 CIT 183 (1983), *Fedtro, Inc. v. United States,* 449 F.2d 1395, 59 CCPA 16, C.A.D. 1028 (1971). Additionally, the *Summaries of Trade and Tariff Information,* USITC Pub. 841, Control 6–5–23 (July 1982) [6] specify LCD's as a "major" example of indicator panels. *Id.* Although not dispositive of congressional intent, the *Summaries* are nonetheless instructive. These factors and the decisions in *Intercontinental* and *Texas Instruments* impel this court to reaffirm the expansive readings accorded item 685.70 TSUS. LCD's are indeed "indicator panels or other visual signalling apparatus" within the meaning of item 685.70 TSUS.

Thus, the question remains whether nematic liquid crystals are "parts" of LCD's for tariff classification purposes. The government claims the liquid crystals are "materials" because they are subject to further processing after importation, and their identity is not fixed with certainty at the time of importation, nor are the crystals dedicated to a specific use.

Given the extensive documentation in the record of the process employed to produce liquid crystals, *see* Plaintiff's Brief at 6–7,

---

5. *Tariff Classification Study,* Explanatory Notes (November 15, 1960).

6. The *Summaries of Trade and Tariff Information* reflect existing administrative practice. *Hawaiian Motor Co. v. United States,* 67 CCPA 42, 617 F.2d 286 (1980).

the government's reliance on cases such as *Heraeus–Amersil, Inc. v. United States,* 10 CIT 258, 640 F.Supp. 1331 (1986) and *Lee Enterprises, Inc. v. United States,* 84 Cust.Ct. 208, C.D. 4860 (1980) seems misplaced. These cases support EM's contention that the liquid crystals are "parts" of LCD's.

In *Heraeus,* the court held that rolled precious metal contact tape was so far advanced in manufacture as to be dedicated solely for use as contacts for electrical relays and was thus classifiable as parts under item 685.90 TSUS. In arguing that the tape was "material" instead, the government made much of the "significant processing," *id.* at 261, the tape underwent *after* importation, and that the tape had more than one use. The court rejected both of these arguments, holding that the tape was sufficiently advanced in the manufacturing process at the time of importation to be identifiable as parts, and that further cutting, positioning and welding of the tape after importation did not characterize the tape as "material" subject to further manufacturing.

Additionally, in *Heraeus,* the tape, which was manufactured to particular specifications, had no other substantial commercial use than as contacts in certain telephone relays, *id.* 10 CIT at 262, 640 F.Supp. 1331. "The absence of any evidence of alternate uses may be considered by the court in determining whether the merchandise is dedicated exclusively to its ultimate use," *id.* at 262, 640 F.Supp. 1331. *See also United States v. Nylonge Corp.,* 48 CCPA 55, 62–63, C.A.D. 764 (1960).

In *Lee,* 84 Cust.Ct. 208, aluminum photopolymer plates used in printing presses were held properly classifiable under item 668.50 TSUS ("other parts of printing machinery"). The plates were designed for use in rotary letterpresses; this machinery could not function for the purposes for which it was designed without the use of the printing plates. *Id.* at 215. Since the

identity of the individual plates was fixed with certainty at the time of importation, *id.* at 213, and the plates were "too far advanced toward the ultimate product to be considered as mere material," *id.* at 215, the court concluded these plates were parts of printing machinery.[7]

Liquid crystals in this case meet the requirements of *Heraeus* and *Lee;* they were dedicated exclusively for use in one product at the time of importation [8] and their character was fixed with certainty due to the advanced manufactured state of the crystals at the time of importation. It is undisputed that during the time of importation, liquid crystals had one sole commercial application in the United States. Plaintiff's Brief at 27–28. They were dedicated exclusively for use in LCD's, which could not function without the presence of liquid crystals. Plaintiff's Brief at 24–25.

In addition, liquid crystals can be utilized in various size LCD's. The size of the display to which the liquid crystals are ultimately dedicated may not be known at the time of importation. Once ascertained, the proportions and amounts (as well as the type of twist agent required, if the crystals are not "predoped") necessary to attain that size and maintain the required physical properties can easily be assembled. As in *Lee,* the lack of dedication at the time of import to any particular size LCD does not remove the liquid crystals from the range of articles under item 685.70 TSUS.

Finally, because the quantity of nematic liquid crystals used to make LCD's varies according to the size of the display does not mean the character of the liquid crystal is not fixed with certainty at the time of importation. EM imports these crystals in bottles of 5, 10, 20, 50 or 100 grams. LCD manufacturers then order the quantity required to produce a specific number of displays. The crystals are removed from the bottles and applied to the particular size display for which they were ordered. Plaintiff's Brief at 20–22. This application may require the addition of a twist agent,

---

7. The court reached this conclusion despite the fact that the imported articles were not dedicated to any particular size printing plates. *Lee* at 214.

8. Even if the liquid crystals had other uses, but were *chiefly* used in LCD's, then under General Interpretive Rule 10(ij), the requirement of *Heraeus* would still be met. *See supra* at 726.

but hardly resembles further manufacturing. The evidence presented by EM reflects a process more akin to an assembly operation, which those in the industry regard as simply "hand-mixing." *Plaintiff's Brief*, at p. 30. The character of the nematic liquid crystals is fixed with certainty at the time of importation due to their advanced manufactured state.

Certain of the items at issue, specifically, thermochromic liquid crystals TM 74A, TM 74B, TM 75A and TM 75B, do not fit the analysis set forth above; however, plaintiff EM has abandoned all claims with respect to these enumerated items.

CONCLUSION

The plaintiff E.M. Chemicals has offered a better classification for imported nematic liquid crystals than that found by the Customs Service, thereby overcoming the presumption of correctness that attaches to the government's determination. The alternative classifications proposed by the government are rejected as well. Nematic liquid crystals are parts of indicator panels or other visual signalling apparatus, and are properly classifiable under item 685.70 TSUS, except for the thermochromic liquid crystals enumerated above.