Slip Op. 99-82

# UNITED STATES COURT OF INTERNATIONAL TRADE

Ludvig Svensson (U.S.) Inc.,          :

               Plaintiff,          :          **Court No. 97-03-00475**
                                              **Before: Barzilay, Judge**
          v.                       :

United States of America,          :

               Defendant.          :

[On classification of screening product used in greenhouses, summary judgment for the Plaintiff.]

Decided: August 17, 1999

Simons & Wiskin (Philip Yale Simons, Jerry P. Wiskin), for Plaintiff.

David W. Ogden, Acting Assistant Attorney General of the United States; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office; Commercial Litigation Branch, Civil Division, United States Department of Justice (Barbara S. Williams, Aimee Lee); Office of Assistant Chief Counsel, United States Customs Service, (Sheryl A. French), of counsel, for Defendant.

## OPINION

**BARZILAY, JUDGE:** Plaintiff, Ludvig Svensson (U.S.) Inc. ("Svensson"), commenced this action challenging the classification of its imported merchandise by the United States Customs Service ("Customs"). This Court has jurisdiction under 28 U.S.C. § 1581(a) (1994). The parties have cross-moved for summary judgment. For the reasons set out in the opinion which follows, the Court grants Plaintiff's motion for summary judgment.

## I.     Background

This case involves the classification of several different types of screening product

manufactured in Sweden and imported in large rolls.  The imported screening product is used solely in the construction of greenhouses to control the environment through shade and heat retention systems, and to control insects. Svensson claims that the imports should be afforded duty free treatment as parts of agricultural products.  Customs classified the screens under various dutiable provisions based on component materials.  The case turns on whether the screening product in its condition as imported has been advanced sufficiently to become a part and is therefore entitled to classification as parts of agricultural equipment or whether it remains a material subject to classification based on component materials.

A.       *Undisputed Facts*

The following material facts are not in dispute.

There are three types of screens in question: (1) environmental screens manufactured in two ways, either with or without backed aluminum foil strips; (2) insect screens, known as Econet screens; and, (3)   plastic laminated screens used as greenhouse roofs, called QLS Ultra or Solarwoven screens. *Pl.'s Response to Def.'s Statement of Undisputed Facts*  at ¶ 9 ("*Pl.'s Response*").  *Def.'s Response to Pl.'s Statement of Undisputed Facts* at ¶ 9 ("*Def.'s Response*").

Environmental screens are parts of  shade and heat retention systems and are used to control the environment within a greenhouse.  *Pl.'s Response* at ¶ 10.  *Def.'s Response* at ¶ 10.   The only commercial use of environmental screens is as part of a shade and heat retention system.  *Pl.'s Response* at ¶ 23.  *Def.'s Response* at ¶ 23.  The screen is the most important part of a shade and heat retention system since it is this part which allows a greenhouse operator to modify the environment of a greenhouse.  *Pl.'s Response* at ¶ 31.  *Def.'s Response* at ¶ 31.  In any shade and heat retention system which utilizes an environmental screen containing backed aluminum foil strips, the backed

aluminum foil strips are essential to the proper functioning of the complete system. *Pl.'s Response* at ¶ 32. *Def.'s Response* at ¶ 32. Without the backed aluminum foil strips, the environmental screens at issue could not be manufactured. *Pl.'s Response* at ¶ 29. *Def.'s Response* at ¶ 29.

Insect screens are used to control the insect population within a greenhouse. *Pl.'s Response* at ¶ 11. *Def.'s Response* at ¶ 11. It is their only commercial use. *Pl.'s Response* at ¶ 24. *Def.'s Response* at ¶ 24.

The QLS Ultra screens are specifically manufactured to function as greenhouse roofs, and, therefore, parts of shade and heat retention systems. *Pl.'s Response* at ¶ 12. *Def.'s Response* at ¶ 12. This is the only commercial use of these screens. *Pl.'s Response* at ¶ 25. *Def.'s Response* at ¶ 25.

At the time of manufacture, the shade factor and energy savings properties of the screens, whether or not containing backed aluminum foil strips, are fixed and not altered by any post-importation processing. *Pl.'s Response* at ¶ 14-15. *Def.'s Response* at ¶ 14-15. In fact, each individual screen cut from a particular roll will have the same shade factor and energy savings properties as any other screen cut from the same roll. *Pl.'s Response* at ¶ 16. *Def.'s Response* at ¶ 16. Moreover, the post-importation processes of adding reinforcing tape, plastic hooks, or sewing of two lengths of screen together to obtain a specific width as requested by the customer, do not alter the shade factor or energy savings properties of the screens. *Pl.'s Response* at ¶ 17-18. *Def.'s Response* at ¶ 17-18.

At the time of importation, the use of the screens is known to be as part of shade and heat retention systems. *Pl.'s Response* at ¶ 34. *Def.'s Response* at ¶ 34. Moreover, the use of the screens is uniform throughout the United States. *Pl.'s Response* at ¶ 35. *Def.'s Response* at ¶ 35. In addition, shade and heat retention systems are agricultural machinery or equipment. *Pl.'s Response* at ¶ 37. *Def.'s Response* at ¶ 37.

*B.* *The Screens*

The brief technical descriptions which follow are necessary to present a complete picture of the screens at issue. Svensson manufactures three types of environmental screens: (1) those consisting of strips of backed aluminum foil and plastic, incorporated in a network of longitudinal and transverse connection yarns, comprised of polyester, acrylic or high density polyethylene; (2) those consisting of strips of backed aluminum foil without the plastic, incorporated in a network of longitudinal and transverse connection yarns; and (3) those consisting of plastic strips incorporated in a network of longitudinal and transverse connection yarns. *Pl.'s Br. Supp. Summ. J.* ("*Pl.'s Br.*") at 5.

Within each type of environmental screen with backed aluminum foil strips, the number of those strips varies according to the amount of shade and heat which a greenhouse operator may need. A greenhouse operator chooses the appropriate screen depending upon a variety of factors, including the crop grown and regional climactic conditions. *Id.* at 14. In certain instances, no backed aluminum foil is necessary in a screen if maximum sunlight, humidity and heat are required. *Id.*

Environmental screens are incorporated into shade and heat retention systems. These systems consist of the screens along with drive motors, cables, aluminum and steel supports, brackets, pulleys, fasteners, and support wires. *Id.* at 12. Shade and heat retention systems are installed inside almost all commercial greenhouses. *Id.* Greenhouse manufacturers either produce greenhouses with the shade and heat retention system installed as original equipment or build greenhouses with enough space in the roof area to accommodate such a system should the greenhouse operator decide to install it once the greenhouse is erected. *Id.*

Insect screens, known as Econet screens, are made of high density polyethylene yarn and ultra violet stabilized acrylic yarns. *Id.* at 15. Svensson manufactures six types of insect screens, each with rectangular openings of a different size. *Id.* At the time of manufacture, some screens have loops woven into the screen, while others are attached to a frame. *Id.* These screens are used to regulate the presence of insects and are manufactured on conventional weaving machinery. *Id.* at 5. These screens are not parts of shade and heat retention systems.

There are two types of plastic laminated screens used as greenhouse roofs: QLS Ultra and Solarwoven screens. *Id.* at 15. The QLS Ultra screen is made of woven monofilament yarn and polyolefin strips laminated with low density polyethylene with hanging wire woven into the screen for installation on hooks. *Id.* The Solarwoven screens are made of woven polyethylene strips laminated with polyethylene and are used as a roof, a side wall, or in roll up applications. *Id.* These screens are incorporated into shade and heat retention systems, and may be used alone as roofs where there is no need to closely regulate nighttime temperatures or as part of retractable roofs. *Id.*

All environmental screens and all plastic laminated screens used as greenhouse roofs are manufactured on a machine which was specially designed by Göran Henningsson of AB Ludvig Svensson, and is described in United States Letters Patent 4,399,671 of August 23, 1983. *Id.* at 9. In the production of these screens, the yarns, backed aluminum foil sheet (when applicable), plastic sheet, polyester hanging wire, and the hinge yarn are simultaneously fed into the screen-making machine. *Id.* This specially designed machine both cuts the plastic and backed aluminum foil sheet into strips, and also knits the yarn resulting in finished product. *Id.*

The screens are imported in rolls which are several hundred feet long. *Id.* at 16. Svensson performs some post-importation processing before selling the screens to customers, principally

cutting the screens to length to meet customers' specifications. *Id.* Where the width of a customer's greenhouse is greater than standard, Svensson sews two pieces of screen together by machine along the length and then cuts the sewn screen as required. *Id.* Plastic hooks may also be installed if a customer's greenhouse requires. *Id.* Svensson adds the hooks and an off-the-shelf thermally setting reenforcing electrical tape. The tape is placed on the screen by a machine and the process takes a few seconds. *Id.*

  C. *Harmonized Tariff Schedule of the United States* ("HTSUS")

The following are the HTSUS subheadings under consideration:

1. Customs' classification of QLS Ultra screens; duty assessed at 8.3% *ad valorem*[1]:

| | | |
|---|---|---|
| 5903 | Textile fabrics impregnated, coated, covered or laminated with plastics . . . | |
| **** | | |
| 5903.90.25 | | Other |

2. Customs' classification of screens without backed aluminum foil strips; duty assessed at 13% *ad valorem*:

| | | |
|---|---|---|
| 6002 | Other knitted or crocheted fabrics: | |
| ***** | | |
| | Other fabrics, warp knit | |
| ***** | | |
| 6002.43.00 | | Of man made fibers |

3. Customs' classification of screens containing backed aluminum foil strips; duty assessed at 4.4% *ad valorem*:

| | |
|---|---|
| 7616 | Other articles of aluminum: |
| ***** | |
| | Other: |

---

[1]Svensson has filed a consent motion to amend the Summons and Complaint filed in this action to correctly identify the QLS Ultra Abri screens, used as greenhouse roof screens, as indicated in Protest number 160-196-100223, entry number 322-3668062-8, and liquidated under HTSUS subheading 5903.90.25.

| 7616.91.00 | 00 | Cloth, grill, netting and fencing, of aluminum wire |

4.      Svensson's proposed classification; duty free:

8436          Other agricultural, horticultural, forestry, poultry-keeping or bee-keeping machinery, including germination plant fitted with mechanical or thermal equipment; poultry incubators and brooders; parts thereof:

*****

Parts:

8436.99                    Other

5.      Svensson's alternate proposed classification for the environmental screens containing backed aluminum foil strips; duty free:

7607   Aluminum foil (whether or not printed, or backed with paper, paperboard, plastics or similar backing material) of a thickness (excluding any backing) not exceeding 0.2 mm:

****

7607.20      Backed:

****

7607.20.50            Other

## II.    Arguments

### A.    *Plaintiff's Argument*

Svensson argues that the imported screens are properly classified as parts of agricultural equipment under HTSUS 8436.99.00 because at the time of import the screens are in an advanced state of manufacture; their identity is fixed with certainty; the screens are dedicated to use; and the post-importation processing is insignificant and part of the installation.

Svensson explains that the screens are in an advanced state of manufacture because they are manufactured on specially designed machines and are made from various materials. *Pl.'s Br.* at 32. These screens are cut to length in the United States, but no further processing is carried out that would increase the products' ability to provide shading, energy savings, or protection against weather and insects. *Id.* at 33.

Svensson asserts that the identity of the screens is fixed with certainty and that they are dedicated to a single commercial use as parts of shade and heat retention or insect control systems. *Id.* With regard to the environmental screens used in either stationary or retractable roof greenhouses the number of strips of backed aluminum foil in each screen determines the level of shade and heat retention necessary for a particular greenhouse. *Id.*

Svensson argues that the post-importation processing is insignificant and is part of the installation process of the shade and heat retention system. Svensson asserts that the principal post-importation processing consists of cutting the material to the length specified by the customer. *Id.* at 36. On rare occasions, a customer's greenhouse is wider than the standard screen and Svensson sews two pieces of screen together to achieve the correct width. *Id.* Only .5% of Svensson's sales require this type of post-importation processing. An additional step in its post-importation processing is the addition of hooks to the screen. *Id.* Svensson explains that such a process is accomplished by running the screen material through a simple machine to apply off-the-shelf electrical tape and by manually attaching plastic hooks. *Id.* According to Svensson, the relative cost and time spent to perform this operation is not significant. *Id.* at 37.

Svensson further argues that its insect screens should not be classified as "other knitted or crocheted fabrics" under HTSUS 6002 because this subheading is a basket provision. *Id.* at 38. Svensson asserts that when a product comes within the ambit of both a basket and a use provision, the use provision takes precedence and, therefore, the insect screens should be classified under HTSUS 8436, a use provision for machinery used on farms, including agricultural schools, co-operatives or testing stations, in forestry, market gardens, or poultry-keeping or bee-keeping farms. *Id.* at 39.

B.        *Defendant's Argument*

Customs argues that the screens are not classifiable as parts of agricultural machinery under HTSUS 8436.99.00. *Def.'s Br. Supp. for Summ. J.* ("*Def.'s Br.*") at 7. Customs asserts that the imported rolls of screening are nothing more than materials and are classifiable under HTSUS 6002, as other knit fabrics, under HTSUS 7616, as other articles of aluminum wire, or under HTSUS 5903.90.25, as other textile fabrics impregnated, coated, covered or laminated with plastics. *Id.*

Customs contends that the cutting to length, sewing and attaching of hooks is a significant post-importation process. *Id.* at 9. Customs also contends that the screens themselves cannot be used to control the environment of a plant or vegetable without undergoing such processes. *Id.* Thus, Customs argues that the imported rolls of screening are nothing more than simple screens. *Id.*

Customs also argues that the screens do not have the essential character of a part of an agricultural machine because one of the crucial dimensions of the product is not set upon importation. *Id.* Customs asserts that material may be classified as an unfinished article only when the fabric in its imported condition has been so far advanced beyond the stage of materials as to be dedicated to and commercially fit for use as that article and incapable of being made into more than one article or class of articles. *Id.* Customs points out that there are no cutting lines or marks set on the screens and that the length of the screen is not known until after importation. Thus, Customs argues, the screens are not parts, but unfinished materials. *Id.* at 11.

III.    **Discussion**

This case is before the Court on the parties' cross motions for summary judgment. Under USCIT R. 56(d), summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Both parties posit that this case is ripe for adjudication by means of summary judgment. The Court agrees. Even though there are differences in the factual positions advanced by each party, summary judgment is appropriate in this action because there are no genuine issues of material fact in dispute. The parties agree on the physical characteristics and details of the imported merchandise, but dispute the classification. Thus, the material facts as to what constitutes the merchandise are not at issue. *See Bausch & Lomb, Inc. v. United States*, 21 CIT ___, 957 F. Supp. 281, 284 (1997), *aff'd*, 148 F.3d 1363 (Fed. Cir. 1998). The Court is then left with the purely legal question involving the meaning and scope of the tariff provision and whether it includes the imported merchandise. *See National Advance Systems v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994). Although there is a statutory presumption of correctness for Customs decisions, 28 U.S.C. § 2639(a)(1) (1994), when the Court is presented with a question of law in a proper motion for summary judgment, that presumption does not apply. *Blakley Corp. v. Unit*ed *States*, ___ CIT ___, 15 F. Supp.2d 865, 869 (1998), (quoting *Universal Electronics, Inc. v. Unit*ed *States*, 112 F.3d 488, 492 (Fed. Cir. 1997) ("[b]ecause there was no factual dispute between the parties, the presumption of correctness is not relevant.")); *see also Goodman Manufacturing L.P. v. Unit*ed *States*, 69 F.3d 505, 508 (Fed. Cir. 1995). It is necessary, however, to address the issue of what deference reviewing courts show to agency determinations pursuant to a *Chevron* analysis. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U .S. 837, 843-845 (1984).

The Federal Circuit's recent decision in *Mead Corp. v. United States*, No. 98-1569, 1999 WL

548779 (July 28, 1999) addressed questions raised by the Supreme Court in *United States v. Haggar Apparel Co.*, ___ U.S. ___, 119 S. Ct. 1392 (1999), regarding the proper standard of review applicable to determinations by Customs of the meaning and scope of tariff terms.

In *Mead*, the court discussed the procedural differences between properly promulgated regulations such as the one at issue in *Haggar* and typical Customs classification rulings which were at issue in *Mead* and in this case. The court concluded that "significant differences . . . convince this court that *Haggar*'s reach does not extend to standard Customs rulings." *Mead Corp.*, 1999 WL 548779, at * 3. Here, as in *Mead*, there are no agency regulations at issue. Because the parties agree on the structure and use of the imported product, the only dispute concerns the competing tariff provisions proffered by each party. Following *Mead*, the Court will not afford deference to Customs classification decisions in this case. The Court must examine both parties' claimed classifications and independently determine which of them is correct, or, if neither, take further measures to determine the correct classification. 19 U.S.C. § 2643(b) (1994).

The heading for agricultural equipment is intended to cover "machinery . . . which is of the type used on farms (including agricultural schools, co-operatives or testing stations), in forestry, market gardens, or poultry-keeping or bee-keeping farms or the like." *Harmonized Commodity Description and Coding System, Explanatory Notes* at 1317 (1996). Moreover, "Congress has traditionally accorded agricultural equipment preferential treatment. It has long been established that 'the tariff provisions for agricultural implements should be liberally construed so that the evident intent of Congress to benefit agriculture [can] be effected.'" *Allis-Chalmers Corp. v. United States*, 7 CIT 108, 111 (1984) (quoting *F.W. Myers & Co. v. United States,* 59 Cust. Ct. 445, 450 (1967)). There is no question that greenhouses are used in agriculture and that the shade and heat retention

systems, which incorporate some of the imported screens, the remaining retractable greenhouse roof screens, and insect screens all are used to regulate and control the environment within a greenhouse. This case, then, turns on how advanced are the screens in their condition as imported. If they are sufficiently advanced so as to be considered parts of agricultural equipment, they will properly be classified as such, according to Congressional intent.

Rule 1(c) of the Additional United States Rules of Interpretation provides:

> a provision for parts of an article covers products solely or principally used as parts of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory.

The Court finds *Bauerhin Technologies Ltd. Partnership v. United States*, 110 F.3d 744 (Fed. Cir. 1997) to be instructive in identifying what is a "part" for tariff purposes. In *Bauerhin* the court considered an appeal from this court regarding the classification of imported canopies. *Id.* at 775. In that case, the importer argued that the canopies should have been classified as parts of car seats, "notwithstanding the fact that [the canopies] are not necessary to the operation of the car seats to which they are attached," and were imported separately. *Id.* at 776. In holding that the canopies were part of the car seats, the court articulated a two part test to differentiate parts from other articles.

First, the court must determine whether the imported item is "an integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article." *Id.* at 778. (quoting *United States v. Willoughby Camera Stores*, 21 C.C.P.A. 322, 324 (1933)). Second, the court must establish whether the imported item is dedicated solely for use with the article in question. *Id.* at 778. (following the holding in *United States v. Pompeo*, 43 C.C.P.A. 9 (1955)).

In the case at bar, the environmental screens and the plastic laminated screens used as greenhouse roofs are an integral part of shade and heat retention systems and of the greenhouses themselves. Insect screens are also an integral part of the greenhouses themselves, even though they do not play a part in shade and heat retention systems. The screens permit greenhouse operators to control temperature and humidity by regulating the amounts of shade and heat retention, and to control the presence or absence of insects in the greenhouse, all for the effective cultivation and protection of plants. Without the screens, the walls in commercial greenhouses would be bare, adorned only by the skeleton of shade and heat retention systems, *i.e.* drive motors, cables, aluminum and steel supports, brackets, pulleys, fasteners, and support wires; there would be no control of temperature and humidity and no shade and heat retention system; and there would be no way to control the insect population within a greenhouse. Moreover, both parties agree that shade and heat retention systems are agricultural machinery or equipment. *Pl.'s Response* at ¶ 37. *Def.'s Response* at ¶ 37. Thus, the first prong of the test is satisfied by virtue of the nature and function of the product itself.

The second prong of the test is also satisfied. The screens are in an advanced state of manufacture, and have no other commercial uses. *Def.'s Response* at ¶ 12, 23-25. All environmental screens and all plastic laminated screens used as greenhouse roofs are manufactured by a specially designed and patented machine. *Pl.'s Response* at 9. The number of backed aluminum foil strips varies according to the amount of shade and heat which a greenhouse operator may need. *Id.* at 14. There are six types of insect screens each manufactured with one of six different openings to take into account various insect populations. *Id.* at 15. Moreover, Customs admits that the screens have "been processed to a point where [they are] recognizable as a new commercial product," but Customs

quickly adds that the screens are "not sufficiently processed to be identified as an individual part of another product," due to the fact that they are imported on rolls and are subjected to post- importation processing. *Def.'s Br.* at 14.

The Court disagrees. An examination of relevant case law shows that a material may be classified as an unfinished article when the fabric in its imported condition has been so far advanced beyond the stage of materials so as to be dedicated to and commercially fit for use as that article and incapable of being made into more than one article or class of articles. *See Doherty-Barrow of TX, Inc. v. United States*, 3 CIT 228 (1982) (holding that steel strips were so far advanced in manufacture as to be dedicated for use in making steel cotton bale ties even though not cut to length, but having only one commercial use); *Heraeus-Amersil, Inc. v. United States*, 10 CIT 258, 640 F.Supp. 1331 (1986) (holding that precious metal contact tape was advanced beyond the state of a material and was part of telephone relays even though the tape was not welded to contacts). *Cf. Avins Industrial Products Co. v. United States*, 72 Cust. Ct. 43, 376 F.Supp. 879 (1974); *Bendix Mouldings, Inc. v. United States*, 73 Cust. Ct. 204, 388 F.Supp. 1193 (1974).

In *Avins*, the court determined that certain imported stainless steel wire did not constitute parts of antennas for automobiles because the wire had to be further manipulated for use as a radio antenna. *Id.* at 886. The parties had stipulated that the wire could be used in other applications with some modifications. *Id.* Moreover, the court explained that determining whether merchandise is a material or an unfinished article depends on the degree of processing it has undergone. *Id.* In that case, the wire was cut to length and was in certain dimensions, making it particularly adaptable for use as a radio antenna. *Id.* The court found there was not sufficient processing to take the product out of the category of wire and into that of an unfinished part. *Id.* In *Bendix*, the court examined the

classification of treated wood moldings commercially used as picture or mirror frames. *Id.* at 204. The court held that the frames should fall under the provision for wood moldings because they were not dedicated to use as any particular frame. *Bendix*, 73 Cust. Ct. at 207.

Here, unlike the products in *Avins* and *Bendix*, the screens are in an advanced state of manufacture, are dedicated to use and their identity is fixed upon importation. The screens are the product of high technology, design and planning and are not simple products; they are complex screens incorporating several different types of materials, manufactured for the specific goal of controlling the various aspects of a greenhouse environment. Moreover, each type of screen may only be used for the purpose for which it was manufactured and the function and purpose of each screen is clearly identifiable upon importation.[2]

In determining that the screens are in an advanced state of manufacture upon importation and that the post-importation processing does not negate that advanced state, the Court relies upon *E.M. Chemicals v. United States*, 13 CIT 849, 728 F. Supp. 723 (1989), *aff'd* 920 F.2d 910 (Fed. Cir. 1990). In that case, this court examined the tariff classification of liquid crystals to be used in liquid crystal displays ("LCDs"). The merchandise was classified as chemical mixtures, but plaintiff contended that it should have been classified as "parts of indicator panels or other visual signalling apparatus." *Id.* at 850.

---

[2]By its own examination of the samples, the Court confirms that the product is so far advanced in manufacturing as to no longer be a material, but a distinct article. In customs classification cases samples of the merchandise are often the most potent witnesses. *See Marshall Field & Co. v. United States*, 45 C.C.P.A. 72, 81 (1958); *Avenues in Leather, Inc. v. United States*, ___ CIT ___, 11 F. Supp. 2d 719, 726 (1998), *aff'd* No. 98-1511, 1999 U.S. App. LEXIS 9710 (Fed. Cir. 1999); *Charles Jacquin et Cie., Inc. v. United States*, 16 CIT 49 (1992); *Permagrain Prods., Inc. v. United States*, 9 CIT 426, 429, 623 F.Supp. 1246, 1249 (1985), *aff'd*, 791 F.2d 914 (Fed. Cir. 1986).

The court held that liquid crystals should have been classified as parts as proposed by the plaintiff. *Id.* at 849. The court found that liquid crystals were formed through a complex chemical process which yielded a discrete, identifiable product utilized, in varying proportions and combinations, exclusively for LCDs. *Id.* at 851, 853. The court also noted that neither party disputed that the only use of liquid crystals was in LCDs and that they had no other commercial uses. *Id.* at 852.

In concluding for the plaintiff, the court noted that the liquid crystals were dedicated exclusively for use in one product at the time of importation, even though the size of the display may not have been known. *Id.* at 857. In addition, the court noted that the character of the liquid crystals was fixed with certainty due to the advanced state of manufacture and that even the addition, after importation, of a chemical stabilizer known as a "twist" agent, did not preclude the liquid crystals from being considered parts. *Id.* Moreover, the court stated that the addition of the twist agent was nothing more than an assembly operation and that it did not resemble further manufacturing. *Id.* at 857-58. In its affirmance of the trial court, the Federal Circuit agreed that there was insufficient subsequent processing to preclude the liquid crystals from being classified as parts of indicator panels. *E.M. Chemicals v. United States*, 920 F.2d 910, 914 (Fed. Cir. 1990).

The Court takes further instruction from *Heraeus-Amersil, Inc. v. United States*, 10 CIT 258, 640 F.Supp. 1331 (1986). In that case, the court found that precious metal contact tape imported on reels had been so advanced in manufacture as to be considered parts of telephone relays rather than semi-manufactured rolled precious metal, even though the tape required cutting and welding after importation. *Id.* at 263, 640 F. Supp. at 1334.

The case at hand is closely analogous to both *E.M. Chemicals* and *Heraeus-Amersil*. In this

case, the parties agree that the imported screens have one commercial use and are dedicated to that use upon importation. Any post-importation processing conducted by Svensson is minor processing attributable to the installation of the screens and does not alter the function or composition of the screen; in fact, Customs admits that the "post-importation addition of reinforcing tape and plastic hooks [does] not alter the shade factor or energy savings factor." *Def.'s Response* at ¶ 17. Cutting the screens to size, sewing two screens together or adding tape and hooks are incidental processes which do not affect the classification of the screens, just as the undetermined quantity of liquid crystals to be used in the LCDs and the addition of a twist agent was immaterial to the classification of that merchandise in *E.M. Chemicals.* The Federal Circuit's decision in *Baxter Healthcare Corp. of P.R. v. United States*, No. 98-1343, 1999 U.S. App. LEXIS 14949 (Fed. Cir. 1999) does not mandate a contrary result although the court held that the proper classification of imported polypropylene filament was as a material under HTSUS 5404 rather than as part of a membrane oxygenator.

As the trial court in *Baxter* noted, whether merchandise is classified as a material or as an unfinished part is determined on a case by case basis. *Baxter Healthcare Corp. of P.R. v. United States*, ___ CIT ___, 998 F. Supp. 1133, 1147 (1998), *aff'd*, No. 98-1343, 1999 U.S. App. LEXIS 14949 (Fed. Cir. 1999) (citing *Harding Co. v. United States*, 23 C.C.P.A. 250 (1936)). As described by the Federal Circuit, in *Baxter* significant post-importation processing was required to create an oxygenator from the imported polypropylene filament:

> To make an oxygenator Baxter groups seven or eight lengths of Oxyphan® [the filament], ties them together, wraps them around a cylindrical steel bellow twenty-two times, and encloses the assembly in a polycarbonate manifold with two sets of inlet and outlet ports.

*Baxter*, No. 98-1343 at 2.

The processing which occurs after importation to the screens in this case falls far short of that described above. Sewing two screens together and adding hooks and tape is similar to the cutting and welding in *Heraeus-Amersil* and the addition of the twist agent in *E.M. Chemicals*. Such processing does not preclude the classification of the screens as parts. It is clear to the Court that the environmental screens are a product so far advanced in manufacture as to serve no other purpose independent of the shade and heat retention systems.

This reasoning applies equally to the environmental screens containing backed aluminum foil strips. It is undisputed that their identity and use as parts of shade and heat retention systems are fixed upon importation just as the screens which do not contain aluminum. The fact that they are composed of backed aluminum foil strips does not take away from their function. In addition, these screens are also manufactured on the same specially designed and patented machine that manufactures the environmental screens that do not contain the backed aluminum foil strips. Moreover, Customs admits that the "energy savings properties of the screens containing strips of backed aluminum foil is fixed at the time of manufacture and is not altered by any post-importation processing." *Def.'s Response* at ¶ 15.

The Court also applies the same reasoning to the classification of the insect screens and to the screens used as greenhouse roofs. Like the environmental screens, the greenhouse roof screens are manufactured on the specially designed and patented machine. *Pl.'s Br.* at 9. The greenhouse roof screens are imported and used exclusively as parts of shade and heat retention systems. *Pl.'s Response* at ¶ 25. The Court concludes that these screens are an integral part of shade and heat retention systems because when placed in a greenhouse with a retractable roof, these screens permit

greenhouse operators to better regulate the environment of a greenhouse, to regulate the application of chemicals and pesticides as well as irrigation, and to permit plants growing within an enclosed greenhouse to benefit from favorable outside weather conditions. The Court has also visually inspected the greenhouse roof screens and, as it found for the environmental screens, concludes that these screens are so far advanced in manufacturing as to be parts of a distinct article. The greenhouse roof screens are dedicated to and commercially fit for use as greenhouse roof screens and are incapable of being made into more than one article.

The insect screens are also imported for and used exclusively in greenhouses as parts of pollination and pest control systems. *Id.* at ¶ 24. The insect screens, however, are manufactured on a conventional warp knitting machine. Nevertheless, these screens are in an advanced state of manufacture. Each of the six screens is designed and manufactured with a different size rectangular opening to take into account varying insect populations. Moreover, it is not disputed that the screens have no commercial use other than as insect screens. *Id.*

Therefore, the environmental screens whether or not containing backed aluminum foil strips, the greenhouse roof screens, and the insect screens, should all be classified under HTSUS subheading 8436.99.00 as parts of agricultural machinery.

Having held that the products in question may be classified under HTSUS 8436.99.00, as parts of agricultural machinery, the Court does not find it necessary to reach the parties' alternative arguments.

**IV.     Conclusion**

Therefore, the Court rules that the imported merchandise, i.e., the environmental screens manufactured either with or without backed aluminum foil strips, the insect screens, and the plastic laminated screens used as greenhouse roofs, should be classified under the subheading HTSUS 8436.99.00, as parts of agricultural machinery.

_____
JUDITH M. BARZILAY
JUDGE

Dated: _____
        New York, New York